Mr. Reinhardt, Your Honors, Counsel, Madam Clerk, my name is Scott Reinhardt, I'm here on behalf of the defendant Angel Amaya, and today we'd like to talk about double jeopardy. As we all know, double jeopardy is not just a concept, it's actually a constitutional right. It's a right that we rarely talk about because I guess the cases just don't come up that much. But this is one of those cases where it actually kicks in. We talk about freedom of speech and protecting that right, we talk about freedom of religion and protecting that right, but for some reason the courts don't always differentiate between when the double jeopardy rule kicks in and when it doesn't. And when I talk about that, I'm not talking about the first trial. We understand that under the first trial, if the government makes a mistake and a mistrial is caused, that it creates a Hobson's choice for the defendant. That Hobson's choice, of course, becomes more difficult on the second mistrial. In other words, it becomes Hobson's nightmare because it's no longer a choice of the devil and deep blue sea, there is no choice. And so what we're trying to do is get a ruling from this court that says that under the double jeopardy rules, you don't get two, three, four bites at the apple. What's the standard? You're arguing for an unprecedented theory. What's the standard review on the accepted theory that if the prosecutor promotes a mistrial, the clause applies? If you're talking constitutional, then it's de novo. If you're talking about abuse of discretion... Well, that's the question. Well, it's de novo because we're talking about a constitutional right of a defendant. And so we're asking you to look at this... So what case... I mean, does Kennedy talk about that? Typically, the Supreme Court writes, tells us their wisdom without addressing the standard review. Well, the case I cited is U.S. v. Zynga, 8th Circuit case. The standard review for constitutional issues is de novo standard review. And so what we're saying here is that this isn't the run of the mill case. This isn't even close. This case has had more twists and turns than any other two cases I've ever had. We've got two mistrials. We have a hiding of evidence by the DEA because of their secret policy. And you've got the U.S. attorney who is not providing the information to the defense. You've just, in a couple of sentences, you've just done 180 from the district court's findings at the sanctions phase. That's why I'm asking about the standard review. Well, that's... The hiding and all that stuff, your adjectives are flatly contrary to what the district court... The way I read it, the district court's resolution of the sanctions question. Well, I disagree, Judge, because if you go back and you look through the transcript, at some point, Judge Bennett says, there's no sense in me sanctioning the U.S. attorney because the 8th Circuit Court of Appeals coddles the prosecutors. And so he was saying to us, there's no sense in me wasting my time giving sanctions here because the 8th Circuit's just going to reverse it. Didn't the court find it was an honest mistake by Jenkins? Well, which time, Your Honor? I mean, how many honest mistakes can you get? You said you weren't talking about the first time. Your whole argument's addressing the second time. Am I not following you? No, I think you're right, Your Honor. I'm saying that... I'm not saying this court should look past the first mistake. I'm thinking that there's cases that suggest that there can be that unusual case where double jeopardy does kick in when you have prosecutorial misconduct in the first case. It does seem to suggest to a certain extent that those are cases where the government goads the defendant into making the mistrial. That's not the final answer, however. But that's where the United States Supreme Court seems to be going. But as we talk about the second mistrial, you've got inappropriate conduct on behalf of the government in three phases. You've got the DEA with an intentional exclusion of reference to the GPS, their failure to put it in the discovery file. On the U.S. attorney's part, you've got a knowing failure to comply with Federal Rule of Criminal Procedure 41, electronic tracking. They don't even comply with it. That's been the rule since 2008. They don't go get a court order. They allow their DEA agents to run wild without a court order and slap GPS on anybody's vehicle. And then when they get caught, they say, well, gee, we kind of feel bad about that. But it was an honest mistake. We thought we could do it. And then you've got, on top of that, the U.S. attorney not even putting this GPS information in the discovery file. We don't get to take depositions. We rely on the U.S. attorney to provide information to us so that we can prepare for trial. When they hide information, the defendant is prejudiced. So you've got prejudice all over the place, Judge. You've got prejudice in two mistrials. You've got prejudice in hiding information. And none of these mistrials were caused by the defendant. And prejudice, you mean just that it was stressful? Well, it's more than stressful. How did it compromise the merits of the defense in the third trial? The defendant ran out of money. The defendant has been sitting in jail for months because of he's waiting for trial. And that was in the brief. Anything else? There's the emotional stress. There's the stigma of being a criminal defendant. But what was there that prejudiced the merits of the defense of the third trial from anything that happened in the first two? I think I'm having trouble pinpointing that right this minute, Your Honor. But certainly, you know, it's demoralizing to the defendant. He's been already run through two jury trials and had him go to a mistrial. How much can you kick a defendant around? How much can you defeat him? I mean, this guy was down and out. He was out of money. Counsel, it has to be more than the number of times. You're familiar with the Standifer case. Standifer had three mistrials. The first two from prosecutorial misconduct. The last from a hung jury. And even after that, there was no double jeopardy violation. Are you familiar with that case? I'm not, Your Honor. I apologize. I haven't found that case. But I guess that... S-T-A-N-D-E-F-E-R, Standifer. Go ahead. Is that an 8th Circuit case? Yes, for sure. Okay, I'm sorry. 1991. Don't worry. Go ahead. But we still come back to the same question, which is, how many kicks of the cat does the government get? How much can you force a defendant to go and sit through a trial? And how much can you forgive the U.S. Attorney's Office for either hiding information, making mistakes during trial, prejudicing a defendant's rights? I mean, to kind of go back to your question, Judge Loken, we liked both juries. We thought we picked good juries. We were ready to proceed. We were ready to go. And we had to give up those juries. And the progress that we made... And so the third one was worse? Well, yeah, it was, because they convicted my client. But I'll tell you why it was worse, because, Judge, we laid out our whole defense in the first two trials. The government had all the benefit of all of our defense and all of our strategy. They were more than ready to go because they had all their information. You knew what Jenkins was going to testify to. You, I don't know if you tried the case. I did. Well, you knew the government. The government had its whole case in, didn't it? Twice? No, no. We only got to the first witness and then a mistrial. I don't understand how they knew your case. Because I laid it out in opening argument. I laid it out in Fort Iron. But now in the first trial, actually, you went several witnesses past Jensen, right? Yeah, but they were like five, 10-minute witnesses. Three or four witnesses past Jensen? Yes. Before you made the motion for mistrial, right? You didn't make the motion for mistrial after the three or four more witnesses, I'm pretty sure. I think it was at the end of the day, yes. Yes, correct. Proceed. Because I wanted to do some research before I made that motion. And the other thing was we had some misunderstandings about whether or not the judge's pre-trial order in limine, which had been under seal, had been received and reviewed. And so that was the other reason that we had some confusion there. And so I wanted to make sure before I started making an argument that I had some solid ground. Was a limiting instruction ever discussed in regard to Jensen at the first trial? Either requested by you or discussed or mentioned by the judge? It was discussed, but discussed briefly. And we on the defense side felt that the prejudice was just so great to have not only the DEA, but the ATF label my client a drug dealer throughout the Midwest. Because he talked about that the ATF from Kansas City had labeled my client a drug dealer. That the prejudice was so great that there's just no way we could overcome it. I mean, if you had a limiting instruction, the poison was already out there. And so we had to then make the motion for mistrial. It wasn't a preference. It was a Hobson's choice as we talked about. And so the question does become one of, at what point does the Hobson's choice become a Hobson's nightmare? And at what point does double jeopardy actually kick in so that a defendant does have some rights? I mean, you can't just water down the double jeopardy clause to the extent that it just doesn't exist. And that's the suggestion of some of these cases and the argument of the opposing counsel. So the state does have all the resources. They do have all the power. And they can make repeated attempts to convict an individual defendant. The question is, how many? And how many times can you subject the defendant to embarrassment, expense, ordeal, and compelling him to live in a continued state of anxiety and insecurity but also sitting in jail month after month before you get to trial? And then having to sit through month after month while you get ready for the next trial and you get ready for the motion to suppress. But this court should tell Judge Bennett that sanctions would have been appropriate here. Thank you. I see my time is up.  Good morning, Your Honors. Tim Duax here on behalf of the United States Attorney's Office for the Northern District of Iowa. May it please the court, counsel. Your Honors, I wanted to address something that was discussed quite a bit during the course of the appellant's argument. And that is the question of prejudice here. There were a few things that were discussed that I wanted to clarify. With respect to the prejudice in this matter, it's important to keep in mind a few facts. Those facts are that all three trials in this matter happened relatively quickly. Counsel just said months in jail. Is that wrong? Well, he did spend some time in jail. However, relatively quickly, if we're talking six months and I'm in jail, I don't think that's relatively quickly. So when you say, what do you mean by relatively quickly? Your Honor, if I may, when the indictment was handed down, the defendant was arrested, he was originally released on conditions. From the start of the first trial till the end of the third trial, what was the time gap? About eight months. And he was in jail the entire eight months? No. He was not in custody until after the second trial. And the reason he went into custody was because he committed an assault and he put information on Facebook about the government's witnesses. And the magistrate judge revoked his release. He had been released from the beginning. So through trials one and through trials two, he was on release. Shortly after trial two, at the end of December of 2011, he goes into custody because he gets himself revoked. Then he stays in custody until the end of May of 2012. So six months, five months, six months? Roughly, correct. But also keep in mind that the defendant did not lose his attorney. He had the same attorney for all of these trials. The basic witness and exhibit list stayed the same for these trials. And so in terms of prejudice, the district court found it to be moderate for a lot of those reasons. But I guess the bottom line in this particular case is Oregon versus Kennedy. And it holds out and intended to hold out a pretty simple, what it hoped to be, a straightforward standard. And that standard was that in order to bar a retrial after the defendant requests and is granted a mistrial, there has to be a showing by the defendant that the conduct underlying the mistrial was intended to goad or intended to provoke a mistrial. And in the present case, as your honors have pointed out to a degree, both of these mistrials occurred very early in the trials. And what's the standard on intended to provoke? Standard or review? With respect to allowing the case to go forward, the district court. No, no, no, no. The Kennedy standard, you just cited a very fact-intensive governing principle from Kennedy. Correct. What is the standard of review for that fact-intensive? Is it a finding or is it a conclusion? Kennedy was a conclusion. The Supreme Court rarely tells us. Does Zuniga or any other case tell us on that question, did the government intend to provoke a mistrial? Is it clear what the standard review is? The intent would be a finding of facts. You'd look at it for clear error. Well, you're just saying that because it sounds right or because the cases say that? I believe there are cases. That's contrary to what counsel argued. I understand. But I believe that it's for clear findings of fact or for clear error. And so I believe that that was the standard that would apply to finding whether or not. That doesn't apply to mixed questions of fact, many, many mixed questions of fact and law. That's why these issues are difficult. I understand, your honor. I'm just saying not sure. I'm not sure. It strikes me as a mixed question of law and fact. Yes, your honor. But I do believe that in order to prevail in light of Organ v. Kennedy, the defendant has to show that there was an intent to provoke a mistrial request. In the first trial, there's a number of facts that mitigate against that conclusion. First of all, it was the government's very first witness. In other words, nothing really bad had happened in the government's case. And I don't believe that the defendant has ever argued a motive for the government to want to get out of that trial. What bothers me, and I'll just jump to it, is the Rule 41F issue, which I haven't studied. And I didn't have the rule because I'm not in my home chambers here. Is it clear that there's a violation? And if so, what does the record say about how the government could have made such a serious blunder? With respect to the warrant requirement, your honor? What's been thrown out is the clear Rule 41F2 error. I don't think that's clear at all. That's any kind of an error.  it provided a means to seek a warrant for a tracking device. I've had some GPS cases we have in recent years from this era when the law was unclear. And is the case law clear that even though the Supreme Court hadn't yet ruled that the criminal rule as opposed to the U.S. Constitution for federal authorities required whatever Rule 41F says? At the time this conduct took place, these trackers were placed on in 2011, March and April of 2011, the rule of law was set forth in Marquez. And that rule was that when agents have a reasonable suspicion that a vehicle's involved in drug trafficking activity, that they are allowed, without a warrant, to place a non-invasive tracking device on a vehicle that is in a public place. And they're allowed to monitor that. And that's what I thought. So where is, did the district court say there was a clear Rule 41F? No. Violation? No. All right. So that's just an argument. That's counsel on appeal. Okay, that's what I wasn't sure about. Correct, your honor. I believe Marquez at that time was binding appellate precedent in the way that that term was used in the Davis case. And so since the agents followed that precedent, which eventually was overruled by Jones later. I know that. So what we really have on that GPS issue is the discovery file problem. Correct. Okay, which is a matter of, that's a question of local practice and procedure, not constitutional law. I agree. I think that's right, okay. I agree. It was a local stipulated discovery order that's commonly entered into in our district. And with respect to that particular issue, the discovery issue. Again, a discovery issue is very- By the way, is it clear that the GPS was put on and the vehicle was in a public place when it was installed? Yes, the district court made that finding and made it based on testimony that was derived about where the vehicle was, your honor. Okay. A discovery issue, because it happens before the defendant's even charged, is very rarely, if ever, going to be the basis for a successful double jeopardy claim. And that's because it's just almost impossible to arrange that. I mean, to think that a government agent and a prosecutor could collude before a case has even been charged and to manipulate pretrial discovery facts in order to provoke a mistrial, a year later or however many months later, is I think the term of the district court used was strange credulity. And so we can't meet that standard of showing that the underlying conduct, in this case, the failure to put the GPS information in the discovery file was designed to goad the defendant into requesting a mistrial. Because it wasn't designed to do that, the defendant hasn't met his burden to show that he cannot be retried. Well, there's a clear 11th Circuit law that how vigorously the prosecutor opposes is one factor here. And of course, you've seen the records here where the prosecutor doesn't oppose at all. I mean, it's... Well, he does oppose it, but he didn't have a lot of information to back it up. However, that's the nature of this kind of issue. Basically, you've just found out, surprisingly so, that you don't even know yet what you don't have or what isn't in the discovery file. You've got to go back and look and see what's in there and what isn't in there. I think the prosecutor knew that the GPS term, the term GPS tracker wasn't in those reports. But the reports did say surveillance showed and then revealed the information that was derived from the surveillance. But I don't think he had it. I just don't think he knew. And if you don't know, you can't say right on the spot when you're confronted. And I think that's why Judge Bennett said, look, I think this was a situation where he didn't want to oppose the mistrial. He did. But it's a situation that due to the time pressures and having to argue it right there, he did not have the time to go back and look through his discovery file and see what was produced, when it was produced. Judge Bennett does acknowledge that there was no rationale articulated, right? You've seen the words used. Were you the prosecutor before? No, I was not. But you've seen the words used. You've seen the transcript. I have. And I'm trying to remember the exact words. But I think you're right. But I don't think that, I think Judge Bennett said, he did oppose it. And he did try to come up with some reason for it. He just didn't have a whole lot of facts at hand without going back and looking through the discovery file just by the nature of that type of issue coming up at that time. Oregon versus Kennedy does not mention anything about the government's opposition, does it? No, it does not. Your Honor, the defendant also, in his brief, had argued that the district court abused its discretion in not sanctioning the government for the discovery violation. I just want to cover that quickly. In this particular case, the district court conducted a couple of hearings and just gave a lot of thought to sanctioning the government, to what type of sanction might be appropriate, discussed a lot of different options. And all of those things are in accord with what his discretion is. He has wide discretion when discovering what to do about discovery violations. And here, he granted a mistrial. He allowed enough time for the government to produce additional information to the defendant. But also, he allowed the defendant to cross-examine the government's agents about the discovery failure, about the information. At the end of all that, at the end of hearing the agent testify, cross-examining to a degree, the court cross-examined himself. Are you aware of a criminal case where an indictment's been dismissed as a sanction for this kind of mistake? Not for this kind of mistake, no. Well, or for what kind of misconduct has triggered the dismissal of an indictment? I don't have a specific case in mind. I know that there have been cases when even intentional misconduct was not sufficient. And I think the cases tend to- Probably a lot of those, but I'm worried about the ones on the other, going the other way. I don't have any case names for you. I think here, I think in order, if you're going to dismiss a case for that reason, I think you have to have very significant bad faith and you have to have substantial prejudice. And the district court here didn't find either one of those. Didn't find bad faith and found that any prejudice was moderate. I think there's a case of de Coteau, and I don't know if I'm pronouncing that correct, that talked about whether- Talked about the need to impose the least significant sanction that would address the conduct. And here, the district court conducted some fact finding about whether or not circumstances had changed since the mistrial and found that the DEA had changed its policies about how it referred to trackers in its reports and also concluded from that, that this was not a problem that was likely to arise again. And so, like I said, I think you would probably, or I think that there's certainly plenty in the record there to support what the district court did in terms of not imposing a more stringent sanction. It's not likely it'll rise after Jones. Absolutely. I think that's absolutely correct, Your Honor, that with the Jones case, they're going to be hidden warrants and you're not going to see a scenario like this again in all likelihood. Unless it's really bad faith, counsel. Yes, you could still have bad faith that would rise to a level and if it was coupled with the substantial prejudice that it likely would be if it was that bad of faith, you could have a finding that a violation would require dismissal. Anyway, Your Honor, if you don't have any more questions, I thank you. Thank you. Does Mr. Reinhardt have some time? Yes, Judge. He has a little over four minutes. Thank you. There was discussion about the Oregon versus Kennedy case and that case also held the defendant's value right to complete his trial before the first jury would be a hollow shell if the inevitable motion for mistrial were held to prevent a later invocation of the bar of double jeopardy in all circumstances. That's the significance of this case. This is that rare case. This is that unusual rare case with two mistrials and prosecutorial misconduct that cries out for dismissal under double jeopardy. And there was talk about the Marquez case. The Marquez case talked about the law in 2007. In 2008, the rules of federal criminal procedure, Rule 47F, which is on page 12 of my brief, Judge, that law went into effect. That rule went into effect. And the suggestion is that you meant 41, right? Page. I think you said 47. Page 12. No, I'm sorry. Talking about the rule. You meant Rule 41, right? Rule 41, yes. I'm sorry. OK, no, that's fine. Can you read Rule 41, though, to mean, though, that if you are going to get a warrant, then this kicks in. If you're not going to get a warrant, this is irrelevant. Just textually looking at page 12. I think it sets the standard that you need a warrant if you're going to do electronic. Can't think of the word. I don't have a rule in front of me. Surveillance. Tracking device. Tracking device. Yes. If you're going to have a tracking device, you need a court order. And that's the law in 2008. So for the U.S. attorney to say in 2010, well, we thought under Marquez we didn't have to, I think that's a little disingenuous. I mean, I'm a divorce lawyer and I figured out that Rule 41 applies. So I don't understand how the U.S. attorney can say, well, gee, you know, we were locking the Marquez case and we really weren't looking at the federal rules of criminal procedure, which, by the way, we work under every day. So looking at Marquez is a red herring because it doesn't show the true state of the law in 2010 when this tracking is taking place. So aside from that, Justices, from our standpoint, there's two options. One is for this court to just say, well, there's a double jeopardy violation. The conviction is overturned. The other option is to say, well, it was an abuse of discretion for the district court judge to ignore the federal rule violation and the rule and the hiding of the discovery information because of a DEA policy. I'm just looking at this language from Judge Benton's question. I don't see anything in there that says flat out if a vehicle's in a, you can't put a device on a vehicle that's in a public place without a warrant. What case has read 41F2 in the way you say is obvious? I haven't found one. I haven't found one that says it either way. Well, it certainly wasn't the, I mean, the post Jones, applying Jones to the pre-Jones cases that I've seen, this has not been part of the landscape, which you're arguing. Well, Jones didn't refer to the Federal Rule of Criminal Procedure 41. Well, I know, but we're talking about D, I mean, I had the case where the DEA was in Arizona and then the car, the vehicle went to Minnesota. And the question was, was there good faith reliance on Ninth Circuit law by the DEA people who installed the device? And I don't remember the year, whether it was 07, 08, 09, or 10, but it was pre-Jones and the Jones was the law. So your argument, is this just what you think it ought to be, or is there some support for your... I'm saying that... Are you just going plain language of 41F2? Yes, yes. Okay. So I'm saying 41F trumps those older cases. I mean, that's the whole purpose for the rule. Those cases that you talk about, Jones and Marquez, are pre-2007 cases. So that's before the Federal Rule of Criminal Procedure 5. Later Eighth Circuit case than Marquez, I think, that it was compatible with the Ninth Circuit case, which was clearly that we dealt with. I see my time is up. Thank you.